AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. |
| | ) | Mag. No. 16-MJ-2035 (JS) |
| | ) | |
| ROBERT A. ELLIOTT, SR. | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ June 2016 _____ in the county of _____ Cumberland _____ in the _____ District of _____ New Jersey _____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| See Attachment A | |

This criminal complaint is based on these facts:

See Attachment B

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Anthony Ruffini
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _September 6, 2016_

_____
*Judge's signature*

City and state: _____ Camden, New Jersey _____

United States Magistrate Judge Joel Schneider
*Printed name and title*

# CONTENTS APPROVED

## UNITED STATES ATTORNEY

By: _Howard Wiener_

Howard Wiener, AUSA

Date: _9/6/16_

**ATTACHMENT A**

**Count One**
**(Possession of an Animal for Participation in an Animal Fighting Venture)**

In or around June 2016, in Cumberland County, in the District of New Jersey, and elsewhere, defendant

ROBERT A. ELLIOTT, SR.,

knowingly possessed a dog ("Dog #J1-E1") for purposes of having the dog participate in an animal fighting venture, namely, an event, in or affecting interstate or foreign commerce, that involved a fight conducted or to be conducted between at least two animals for purposes of sport, wagering, or entertainment, in violation of Title 7, United States Code, Section 2156(b) and Title 18, United States Code, Section 2.

1

**Count Two**
**(Possession of an Animal for Participation in an Animal Fighting Venture)**

In or around June 2016, in Cumberland County, in the District of New Jersey, and elsewhere, defendant

ROBERT A. ELLIOTT, SR.,

knowingly possessed a dog ("Dog #J1-C4") for purposes of having the dog participate in an animal fighting venture, namely, an event, in or affecting interstate or foreign commerce, that involved a fight conducted or to be conducted between at least two animals for purposes of sport, wagering, or entertainment, in violation of Title 7, United States Code, Section 2156(b) and Title 18, United States Code, Section 2.

2

## ATTACHMENT B

I, Anthony Ruffini, am a Special Agent with the United States Department of Agriculture, Office of Inspector General. I have knowledge of the facts set forth herein based on my personal participation in this investigation, my conversations with other members of law enforcement and my review of oral and written reports from other law enforcement officers, and my training and experience investigating dog fighting ventures. Where statements of others are set forth herein, these statements are related in substance and in part. Because Attachment B is being submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact that I have learned during the course of the investigation.

## I.   THE DEFENDANT

1.     At all times relevant to this complaint, unless otherwise indicated, Defendant ROBERT A. ELLIOTT, SR. (hereinafter "ROBERT ELLIOTT") was a resident of Millville, New Jersey.

## II.   OVERVIEW OF DOG FIGHTING

2.     Dog fighting typically involves pit bull-type dogs that are released by their owners or handlers in a controlled environment to attack each other and fight.  The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

3.     Prior to a dog fight, dog owners or handlers may enter into an agreement with their opponent, often referred to as a "match," "fight," or "show." The owners or handlers may agree upon: (1) the sex and set weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact location of which is often a secret until shortly before the fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective fighters.

4.     Dogs used in animal fighting ventures are housed separately from other dogs, in pens, cages, or on chains, so that they will not hurt or kill other dogs when the handler is absent. Heavy chains are often used when restraining dogs to develop neck strength in dogs used for fighting purposes.

5.     Dog fighters often take steps to house fighting dogs away from public view, such as by placing them inside sheds, garages, barns, or basements, or by erecting tall opaque fences around areas where fighting dogs are housed.

6.     "Champion" or "Grand Champion" status refers to a dog who has won three or five fights, respectively.

3

7.     Dog fighters may keep multiple dogs at a time in order to maintain a stock of dogs at different weights and both sexes for dogs to be matched for a fight according to weight and sex; to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dog fighting bloodline; and to have a sufficient number of dogs to fight dogs more than two to three times a year.

8.     Finding an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year is known as "calling out a weight." Dog fighters often "call out a weight," by telephone, text, or e-mail, to known dog fighters in several states, to increase their odds of finding a match.

9.     Once a dog fighter locates an opponent and agrees upon terms, the match is "hooked" or set up. The dog then typically undergoes a conditioning process.  Dog handlers often refer to this conditioning process as putting the dog "in a keep." This "keep" may involve treadmills to run and exercise the dogs away from public view; weight pulls to increase the dog's strength and stamina; "spring poles" and "flirt poles" to build jaw strength and increase aggression; and the administration of drugs (such as steroids), vitamins, and other medicine. "Animal pelts" are also common for dog fighters to use to excite and bait dogs during dog fighting training sessions.

10.     Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches.

11.     Dog fighters often attempt to mend the injuries of their own dogs, rather than seek veterinary attention, which might raise suspicion regarding the cause of their dogs' injuries. Dog fighters also use veterinary supplements and pharmaceuticals to enhance fighting dogs' stamina and to keep injured dogs fighting longer.

12.     Although dogs used for fighting are often housed outside, a dog in a keep may be housed indoors or near the owner/handler for several reasons. One reason is to prevent the dog from becoming sick or injured by other dogs before an upcoming match, which could cause the dog to forfeit and the owner to pay a forfeit fee. Another reason is that dogs in a keep require constant exercise and monitoring, which is easier when the dog is in close vicinity rather than off-site or outside. Dogs intended for fighting purposes are also often housed inside residences if they are injured, ill, pregnant, weaning, or if a dog fighter does not have another location to keep them or wants to keep them out of view.

13.     It is common for those operating dog fighting ventures to maintain pedigrees, books, records, ledgers, and journals relating to the purchase, transportation, sale, breeding, and training of fighting dogs. These materials may be kept in both hard and electronic copy.

### III. THE POSSESSION OF DOGS BY DEFENDANT ROBERT ELLIOTT FOR USE IN AN ANIMAL FIGHTING VENTURE

#### A. Pit Bull-type Dogs and Dog Fighting Paraphernalia at Defendant Robert Elliott's Residence

14.     On June 1, 2016, Frank Nichols ("NICHOLS") and other individuals were charged by Complaint with violations of the federal Animal Welfare Act, 7 U.S.C. § 2156, pertaining to dog fighting. *See United States v. Gaines, et al.*, Mag. No. 16-8049 (LDW). On the same date, law enforcement officers executed a search warrant of a residence on a multi-acre property in Millville, New Jersey (the "Residence") where NICHOLS lived. Defendant ROBERT ELLIOTT also lived at the Residence.

15.     During the search of the Residence, law enforcement officers seized thirteen live pit bull-type dogs. Seven of the dogs were housed on heavy chains in a wooded area behind the house. The dogs were spaced so that they could not reach one another. Two additional dogs were housed individually in pens in the wooded area near the chained dogs. Law enforcement officers found three more dogs in shipping crates in the unfinished basement of the Residence. One of the thirteen dogs, who appeared ill, was found in a crate in a room on the first floor of the Residence.

16.     Most of the dogs found outside the Residence were located behind a section of stockade privacy fence approximately six feet high and fifty feet long. The fence was comprised of a single wall approximately one hundred feet behind the Residence, and did not enclose any area adjacent to the Residence.

17.     Several of the dogs had scars and other signs of injury, such an ear avulsion (missing part of one ear), stifle pain, and broken, dead, or excessively worn teeth.

18.     In addition, all thirteen dogs had untreated veterinary conditions, including eye entropion, yeast otitis, pustular dermatitis, nasal and ocular discharge, and skin abrasion.

19.     Inside the Residence and inside a shed behind the Residence near where the dogs were found, law enforcement officers seized the following:

    a. Break sticks, which are used to pry open a dog's mouth in order to release a hold that the dog has on another dog;

    b. A stand often called a "rape rack" (or "breeder stand" as referred to by defendant ROBERT ELLIOTT) designed to hold a female dog off the ground and immobilize her while a male dog mounts her. The device is used where the female dog is too dog-aggressive to mate otherwise;

   c. A photograph print of a red female dog, strapped to the same breeding stand, being bred to a black male dog;

   d. A box containing veterinary medications, a skin stapler, numerous needles and syringes, catheters, IV bags and tubing, sutures, and suture removing tools;

   e. Testosterone boosting supplements, which are often used by dog fighters to increase muscle mass and aggression of dogs before a fight;

   f. Veterinary wound powder and spray wound treatment;

   g. Two dog fighting books and several dog fighting magazines, including one issue dated Summer 2016; and

   h. Large-size hanging scales, which are used to weigh dogs before a dog fight.

20. Several of these medications and instruments identified manufacturers located outside of New Jersey.

21. Defendant ROBERT ELLIOTT was present during the search and voluntarily stated to law enforcement officers that he and his family owned ten of the thirteen dogs, which included "Dog #J1-E1" and "Dog #J1-C4." Specifically, he admitted that he and his family owned all of the dogs outside, the dog in the living room, and one of the dogs in the basement. He also stated that one of the thirteen dogs was in his family's possession but was owned by his nephew or cousin.

22. Defendant ROBERT ELLIOTT also identified to law enforcement officers most of the dogs by name based on the dogs' locations on the property. He stated that he and his family owned and/or possessed the dogs named "Shottsie" (pronounced "Sashy"), "Neicee" (pronounced "Neecy"), "Hope," "Twenty," "Johnny," "Nikki," "Bobo," "Poker Face," "Ruby," and "Samantha."

23. Defendant ROBERT ELLIOTT stated that he had built the "breeder stand" found in the Residence.

24. Defendant ROBERT ELLIOTT also explained where he obtained various items found inside the box described above in paragraph 19(d), which contained medical supplies.

### B. Defendant Robert Elliott's Dog Fighting Pedigrees at the Residence

25.     Dog    fighters    post    dog    pedigrees    on    the    website http://www.apbt.online-pedigrees.com, known as "Peds Online," which is available on the Internet. Dog fighters use this as a repository for breeding information to prove and verify the lineage of their dogs or dogs they are fighting against or considering buying or breeding to. The pedigree for each dog typically contains: an indicator of how many fights the dog has won, whether the dog is a "Champion" or a "Grand Champion," the breeding history of the dog going back four generations, and indicators of the number of fights that dogs in their bloodline have won. There is also a field for "Breeder" and "Owner."   Some pedigrees have pictures of dogs as well.

26.     Law enforcement officers seized approximately twenty-three printouts of fighting dogs from "Peds Online" found at the Residence.  Defendant ROBERT ELLIOTT told law enforcement officers that these printouts belonged to him.

27.     In addition, law enforcement officers seized from the Residence approximately forty-six fighting dog pedigrees and registry documents from dog fighting registries other than "Peds Online." Approximately thirty-nine of those identified defendant ROBERT ELLIOTT as the owner or breeder of the dog, and two of these approximately thirty-nine pedigrees included the pedigrees for "Dog #J1-E1" and "Dog #J1-C4." The pedigrees for "Dog #J1-E1" and "Dog #J1-C4" indicate that the pedigrees were issued by the "Registry of the American Pit Bull Terrier," with a listed address in Plumtree, North Carolina.

28.     Law enforcement officers also seized a document containing a completed application form to register dogs with the "Registry of the American Pit Bull Terrier." The document indicates that the completed form should be mailed to the Registry at its address in Plumtree, North Carolina. The document contains handwritten information listing the applicant as "Robert Elliott."

29.     Furthermore, one of the forty-six fighting dog pedigrees pertained to a dog listed as "Elliott's 'Shottsie.'" This document contains a photograph of a dog and lists "Robert Elliott" as the owner, with an address of a Post Office box in Fairton, New Jersey. This Post Office box is listed on defendant ROBERT ELLIOTT'S New Jersey driver's license.

30.     The pedigree of "Shottsie" also shows that she was bred from a dog fighting bloodline, including multiple dogs identified as "Champion" or "Grand Champion" dogs on the pedigree.

7

31.    Moreover, the photograph of "Shottsie" in the pedigree matches the dog seized from the Residence that defendant ROBERT ELLIOTT identified as "Shottsie."

32.    At the Residence, law enforcement officers also seized pedigrees from dog fighting registries for dogs named "Nikki," "Neicee," "Hope," and "Twenty" that listed defendant ROBERT ELLIOTT as the owner. Defendant ROBERT ELLIOTT also told law enforcement officers that the dogs found at the Residence included dogs "Nikki," "Neicee," "Hope," and "Twenty" and that he and his family owned these dogs.

33.    The pedigrees for "Nikki," "Neicee," "Hope," and "Twenty" indicate that each of the dogs was bred from a dog fighting bloodline that included "Champion" or "Grand Champion" dogs.