UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ROBERT A. ELLIOTT, SR.,<br><br>*Defendant.* | Crim. Action No.: 3:17-cr-00051 (PGS)<br><br>**MEMORANDUM<br>AND ORDER** |

This matter comes before the Court on Defendant Robert A. Elliott, Sr.'s ("Defendant" or "Elliott") motion for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A). (ECF Nos. 333, 334). Elliott, a prisoner serving a term of twenty-four months' imprisonment at FCI Fort Dix, is seeking compassionate release on the grounds that his alleged chronic asthma, a lung defect, a history of obesity, and digestive and coronary issues put him at high risk of severe illness and/or death if he were to contract the novel coronavirus ("COVID-19"). Another factor is that Elliott has been diagnosed with dyslexia, a cognitive impairment.[1] In addition, Elliott also seeks placement in home confinement pursuant to 18 U.S.C. § 3624(c)(2) and § 12003(b)(2) of the CARES Act. The Court heard oral argument on July 14, 2020 and received telephonic testimony from Mr. Elliott[2] and from Dr. Ravi Sood, a Medical Officer at FCI Fort Dix.[3] For the reasons stated below, Elliott's motion is denied.

---

[1] As defined in the First Step Act, dyslexia is "an unexpected difficulty in reading for an individual who has the intelligence to be a much better reader, most commonly caused by a difficulty in the phonological processing (the appreciation of the individual sounds of spoken language), which affects the ability of an individual to speak, read, and spell." 18 U.S.C. § 3635(1). Section 3632 of the First Step Act requires, inter alia, prisons to: (i) "determine the appropriate use of audio technology for program course materials with an understanding of dyslexia"; (ii) conduct dyslexia screening during the prisoner intake process; and (iii) screen for dyslexia during "each periodic risk reassessment of a prisoner." 18 U.S.C. §§ 3632(a)(8), (h)(1)(B). Moreover, prisons are required to "incorporate programs designed to treat dyslexia;" however under the statute, the Attorney General has a period of time to develop the program. Therefore, it is unknown whether any such programs were in place at the time of Elliott's incarceration. 18 U.S.C. § 3632(h)(2).

[2] The transcript is designated as "1T".

[3] The transcript is designated as "2T".

# I.

Elliott is a fifty-one-year-old inmate at FCI Fort Dix in Fort Dix, New Jersey. (Gov't Opp. Br. at 2, ECF No. 335). Following a jury trial, on October 16, 2018, Elliot was convicted of one count of conspiracy to possess animals for use in animal fighting ventures, as well as several counts relating to the possession of dogs for that purpose, in violation of 18 U.S.C. § 371 and 7 U.S.C. § 2156(a)(1), (b). (Moving Br. at 1, ECF No. 333; Gov't Opp. Br. at 2; Judgment, ECF No. 282).

On May 30, 2019, this Court sentenced Elliott to a prison term of 24 months and three years of supervised release. (*See* Sentencing Tr. at 22:12-22, ECF No. 329). Elliott commenced serving his sentence at FCI Fort Dix on July 6, 2019. (Moving Br. at 1-2). Elliott's dyslexia was noted in the presentence report (¶¶ 212, 316, 323 and 386) and it was considered as a factor in his sentencing. (Sentencing Tr. 20:11-18). He is currently scheduled for transfer to a "halfway house" in December 2020, and for release on March 21, 2021. (*Id.*).

Elliott has appealed both his conviction and sentence. (Gov't Opp. Br. at 2). The parties have each filed briefs on that appeal in the Third Circuit, and the appeal remains pending. (*Id.*). In January 2020, a Federal Public Defender was appointed to represent Elliott in this matter. (Moving Br. at 2). On April 18, 2020, Elliott's appointed counsel filed a request with the Warden of FCI Fort Dix for either compassionate release or transfer to home confinement pursuant to Attorney General Barr's directive issued in response to the COVID-19 pandemic.[4] (*Id.*). On May 30, 2020, both requests were denied. (*Id.*). On June 2, 2020, Elliott moved this Court for compassionate release under 18 U.S.C. § 3582(c), arguing that the COVID-19 pandemic and his alleged asthma, lung obstruction, obesity, and digestive and heart problems warrant release. As indicated above,

---

[4] AG Barr's Memorandum effectively granted the BOP the authority to exercise its discretion in transferring prisoners to home confinement, beginning at the facilities that thus far have had the highest levels of COVID-19 transmission. *See* Memorandum for Dir. of Bureau of Prisons, Increasing Use of Home Confinement At Institutions Most Affected by COVID-19 (Apr. 3, 2020), available at *https://www.justice.gov/file/1266661/download.*

the Court initially held oral argument on Elliott's motion for compassionate release on July 14, 2020. At that hearing, Elliott's counsel argued that compassionate release was warranted because, *inter alia*, (1) Elliott could not access for many months his medications prescribed by the prison physician for his asthma and a gastrointestinal issue (*e.g.*, reflux), and (2) Elliott had learning and comprehension difficulties emanating from dyslexia disorder. In addition, counsel argued that the conditions at Fort Dix were unsanitary and non-compliant with the COVID-19 safety protocol issued by CDC. After hearing counsel's arguments, the Court heard testimony of Mr. Elliott and Dr. Ravi Sood telephonically with the parties' consent. (1T 3:13-6:25).

Mr. Elliott testified that he suffers from dyslexia. He cannot read or write. As a result, he cannot obtain a driver's license, e-mail his family, or fill out a form. (1T 7:14-25). Although he was prescribed an inhaler (Albuteral) and over-the-counter medication for reflux (Rolaids) during his initial medical examination at Fort Dix, (1T 8:4-12), Elliott asserted he could not obtain them because he cannot read, and he was not adequately verbally advised where and how to obtain the inhaler and Rolaids. Elliott recounted that prison staff at the pharmacy ridiculed him because he was incapable of completing the required forms, and snidely commented that he "should go back to school." (1T 10:16-23). After about one year (July 2020), Elliott obtained his prescribed inhaler and reflux medications. (1T 11:7-9; 13:6-8).

Elliott also testified regarding the alleged poor health and safety conditions at Fort Dix, particularly with respect to COVID-19 safety and transmission prevention. Namely, Elliott indicated that, *inter alia*, rooms in his building are overcrowded, prisoners are not wearing their required face coverings in common areas, the showers are overcrowded and "filthy," and social distancing protocol is not being observed. (1T 13:20-16:10).

In response, the Government called Dr. Ravi Sood, a Medical Officer at Fort Dix. Dr. Sood is a general practitioner who attends to the medical needs of the adult and elderly male

3

population at FCI Fort Dix.

Most importantly, Dr. Sood testified that Elliott's dyslexia should not have impeded Elliot's ability to access medical care and obtain prescribed medications at Fort Dix. (2T 4:23-6:4). In particular, Dr. Sood testified that during the prison's orientation program, prisoners are instructed in writing and verbally on the protocol to obtain medical attention and prescriptions. The prison considers education level and special needs with respect to each inmate. (2T 4:23-6:4). Moreover, Dr. Sood testified that the prison pharmacy staff members are trained to help prisoners obtain their medications, especially those who have reading and writing difficulties. (2T 9:14-10:7).

In addition, Dr. Sood acknowledged that he had two medical encounters with Elliott. (2T 10:8-12). In July 2019, Dr. Sood performed an initial health screening of Elliott and prescribed him an inhaler for his asthma (2T 10:15-11:4), though Elliott did not receive his inhaler until after his second visit with Dr. Sood in July 2020.

Moreover, at that initial encounter, Elliott told Dr. Sood of his dyslexia and Dr. Sood testified that he "tailored [the] clinical encounter according[ly]." (2T 11:7-12:3). However, he did not indicate any special dyslexia screening was conducted or subsequent programs were recommended except that Elliott should consult with the prison's Psychology Department for assistance with respect to his dyslexia. (2T 30:18-31:18).[5]

During the second medical encounter with Elliott in July 2020, Dr. Sood performed a medical evaluation of Elliott's asthma, prescribed two more inhalers, and verbally instructed Elliott how to obtain the medication from the pharmacy. (2T 13:25-14:9). According to Dr. Sood's evaluation, Elliott was not suffering symptoms of an asthma flare-up at that time, but he

---

[5] According to Elliott's medical records, at one point he consulted with the Psychology Department seeking to enroll in a non-residential drug program. (2T 31:22-32:24).

4

nevertheless prescribed Elliott the medication to use as needed. (2T 14:10-14:24). Consistent with Elliott's testimony, Dr. Sood testified that Elliott received his prescribed medication shortly after the second visit. (2T 14:22-24).

## II.

For many years, it has been the policy that once a federally imposed sentence commences, a district court has limited authority to modify that sentence. *Dillon v. United States*, 560 U.S. 817, 825 (2010).

Recently, Congress amended that strict policy through the First Step Act (18 U.S.C. § 3582(c)(1)(A)), which allows a criminal defendant to request a reduction in sentence – also known as "compassionate release" – for "extraordinary and compelling reasons" after exhausting administrative remedies.[6] 18 U.S.C. § 3582(c)(1)(A); *see United States v. Alexander*, No. CV 19-32 (FLW), 2020 WL 2507778, at *5 (D.N.J. May 15, 2020).

A court may reduce an inmate's sentence if (1) it finds that there are "extraordinary and compelling reasons" that warrant a reduction; (2) the reduction would be "consistent with applicable policy statements issued by the Sentencing Commission" as well as the Court's independent assessment; and (3) it considers the sentencing factors set forth in § 3553(a), as applicable. *United States v. Brown*, No. CR 07-19 (RBK), 2020 WL 2466081, at *2 (D.N.J. May 13, 2020) (citation omitted).

A defendant seeking a reduction in his sentence under the First Step Act "bears the burden" of proving compelling and extraordinary reasons exist to justify compassionate release. *United States v. Sellers*, No. CR 10-434 (RMB), 2020 WL 1972862, at *1 (D.N.J. Apr. 24, 2020) (citing 18 U.S.C. § 3582(c)(1)(A)).

---

[6] The parties agree that Mr. Elliott complied with the administrative exhaustion requirement, as such it is not discussed herein.

Congress did not define the term "compelling and extraordinary reasons," but instead directed the U.S. Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). Although the Sentencing Commission has not issued any such directive, the Commission's Policy Statement still provides some useful guidance. *See Alexander*, 2020 WL 2507778, at *3; *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *4 (E.D. Pa. Apr. 1, 2020); *see also* U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G."), § 1B1.3, Application Note 1 (U.S. Sentencing Comm'n 2018).

The Policy Statement provides that a defendant may demonstrate extraordinary and compelling reasons for compassionate release based on: (1) the defendant's medical condition; (2) the defendant's age; (3) the defendant's family circumstances; or (4) "other reasons." U.S.S.G. § 1B1.13, Application Note 1. More pertinently, Elliott may show extraordinary and compelling reasons for release based on his medical conditions where:

    (i)    The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory) . . . ; [or]

    (ii)    The defendant is: (I) suffering from a serious physical or medical condition; (II) suffering from a serious functional or cognitive impairment, or (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.*, Application Note 1(A). A defendant must generally demonstrate that his medical conditions fall into one of those categories in order "to carry his burden for proving he merits compassionate release." *See United States v. Rodriguez-Orejuela*, No. 03-CR-20774, 2020 WL 2050434, at *7 (S.D. Fla. Apr. 28, 2020) (collecting cases).

6

Moreover, according to the Third Circuit, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Rather, "the Court must conduct a highly individualized inquiry of this Defendant to determine whether COVID-19 in conjunction with his alleged underlying medical conditions constitutes an extraordinary and compelling reason for release." *United States v. Catanzarite*, No. CR 18-0362 (ES), 2020 WL 2786927, at *3 (D.N.J. May 29, 2020).

Here, Elliott argues that asthma, an "obstructive lung defect," a history of obesity, as well as digestive and heart issues justify his request for early release. (Moving Br. at 3, 7-8). Those medical conditions are discussed below.

First, Elliott argues that his asthma constitutes an extraordinary and compelling reason for his release, in light of the COVID-19 pandemic. (Moving Br. at 3, 7-8). On June 25, 2020, the CDC updated its guidance as to which medical conditions subject a person to increased risk of severe illness from COVID-19. Most notably, the CDC no longer includes asthma on its list of medical conditions that are known to increase the risk of severe illness from COVID-19. *See People With Certain Medical Conditions*, CDC: Your Health, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Sept. 11, 2020). Rather, asthma has been relegated to the CDC's list of medical conditions that "might" increase the risk of severe illness from COVID-19. *Id.* Regardless, Elliott's medical records do not show that he is suffering from any serious complications due to his asthma. For example, an examination in 2015 found that he was "very active with regards to his wrestling, [and] working out," and noted a history of "mild reactive airway disease." (Moving Br. App'x at 90-91). Examinations in late 2018 noted that Elliott denied respiratory symptoms, had "uncomplicated asthma," had lungs clear to

7

auscultation bilaterally, had no wheezing, had no rhonchi, and was stable to the point that no specific follow-up was recommended. (*Id*. at 30-37). Similarly, Elliott's most recent examination report on December 30, 2019 indicates that he had "no acute distress, no pain, no shortness of breath and ambulates without difficulty." (Gov't Opp. Br., Att. A, ECF No. 335-1). Likewise, in July 2020, Dr. Sood testified that he examined Elliott's asthma condition and did not detect any flare-up. (Sood Tr. at 13:25-14:24). Nevertheless, Dr. Sood prescribed Elliott two asthma inhalers, which Elliott now has in his possession. (*Id*.). Under these circumstances, Elliott's asthma does not rise to an extraordinary or compelling reason warranting his release. *See, e.g., United States v. Slone*, No. CR 16-400, 2020 WL 3542196, at *5-7 (E.D. Pa. June 30, 2020); *United States v. Torres*, No. CR 18-414, 2020 WL 3498156, at *7-10 (E.D. Pa. June 29, 2020); *United States v. Osborne*, No. 4:05-CR-00109-BSM-12, 2020 WL 3258609, at *2 (E.D. Ark. June 16, 2020); *United States v. Towel*, No. CR 17-519-6, 2020 WL 2992528, at *5 (E.D. Pa. June 4, 2020); *cf. United States v. McCalla*, No. CR 11-452 (FLW), 2020 WL 3604120, at *3 (D.N.J. July 2, 2020).

Relatedly, Elliott alleges that he was unable to access his inhaler due to his dyslexia[7] -- he could not read directions to fill out the necessary forms to have the prescription filled at the time of his admission to FC1-Ft. Dix.

Notwithstanding the fact that Elliott is now in possession of his medication, (Elliott Tr. at 11:7-9; 13:6-8), Dr. Sood testified that Elliott was adequately advised verbally how to pick up prescribed medications and receive medical care at the facility, (*see* Sood Tr. at 4:23-6:4). In addition, Dr. Sood testified that he appropriately took into account Elliott's dyslexia when treating him, and verbally instructed him how to obtain his inhaler. (*See id*. at 11:7-12:3; 13:25-14:9).

---

[7] The issue of dyslexia was mentioned but not adequately presented within this motion. Reviewing the Policy Statement, a defendant may have an extraordinary reason for release if he is "suffering from a serious functional or cognitive impairment . . . that substantially diminishes the ability of the defendant to provide self care . . . from which he or she is not expected to recover. U.S.S.G. § 1B1.13, Application Note 1. Neither party argued that dyslexia constituted a serious, progressive impairment that diminished his ability to provide self care, nor whether Elliott was expected to recover.

Second, with respect to the obstructive lung defect, Elliott's medical records indicate that this condition was initially diagnosed on September 24, 2012 as a "severe obstructive lung defect," and by March 24, 2015, it had been downgraded to a "mild obstructive lung defect." (Moving Br., App'x at 73, 78, ECF No. 333 (ECF pagination)). There are no other recent medical records before the Court indicating that Elliott is presently suffering from any ailments or complications due to the lung defect. Moreover, although Elliott summarily asserts that the lung defect places him at higher risk of severe illness from COVID-19, he does not describe how or why that is the case. For example, he has not argued that the CDC's list of underlying medical conditions that put people at an increased risk of severe illness from COVID-19 include his lung defect. Notably, during the three hearings conducted with respect to this motion, Elliott did not raise the lung defect as a basis for granting compassionate release.

Third, while Elliott's medical records indicate that he has a history of obesity, his most recent BOP medical records indicate that he is no longer obese. According to the CDC, a person is in the obese range if their Body Mass Index ("BMI") is 30.0 or higher. *Defining Adult Overweight and Obesity*, CDC: Overweight & Obesity, https://www.cdc.gov/obesity/adult/defining.html (last visited Sept. 11, 2020). Records from a medical examination conducted on December 30, 2019 show that Elliott's BMI was 29.4, which falls below the obesity threshold. (Gov't Opp. Br., Att. A).

Moreover, Dr. Sood testified that when he evaluated Elliott in July 2020, he observed that Elliott had lost approximately 70 pounds – he reduced his weight from 273 pounds to 201 pounds. (2T 29:2-21). Elliott purportedly told Dr. Sood that Elliott "wanted to make the best of [his] time" in prison, so he focused on weight loss by exercising and dieting. (*Id.*). According to Dr. Sood, Elliott's weight loss was healthy. (2T 29:22-30:8).

Accordingly, without any evidence showing that Elliott is currently obese, compassionate release on that basis is not warranted. *United States v. Falci*, No. CR 17-228, 2020 WL 3410914, at

9

*4 (D.N.J. June 22, 2020) (denying motion for compassionate release where defendant was sixty years old and suffered from "obesity, hypertension, diverticulosis, diverticulitis, history of smoking, gallbladder removal, colon reconstruction"); *United States v. Alexander*, No. Crim. No. 19-32, 2020 WL 2507778, at *1 (D.N.J. May 15, 2020).

Finally, Elliott's briefing makes fleeting references to unspecified digestive and coronary issues. Elliott does not provide any detail regarding those issues, nor does he describe how or why those conditions constitute extraordinary and compelling reasons for his release. At most, Elliott established during his testimony that he has acid reflux with is adequately treated with over-the-counter Rolaids from the commissary. (See Elliott Tr. at 23:22-24:14). Accordingly, Elliott has not carried his burden of demonstrating that his medical conditions warrant his release. *See Rodriguez-Orejuela*, 2020 WL 2050434, at *7.

In addition, a court may look "beyond the medical conditions" of the defendant to determine whether compassionate release is appropriate in light of the COVID-19 crisis. *Catanzarite*, 2020 WL 2786927, at *5. Namely, the court may consider Elliott's dyslexia and the conditions at the detention facility. *Id.* Here, Elliott is residing at FCI Fort Dix. According to the Government, the COVID-19 situation is improving at that facility. (Govt. Opp. Br. at 8). The Government avers that COVID-19 infections are down from a high of approximately 40 inmates having tested positive in May to only **2 inmates** as of August 3, 2020, out of a total population of 2,766 inmates. (*Id.*; *see also COVID-19 Cases*, Federal Bureau of Prisons: COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (last visited Sept. 11, 2020). There are currently no known staff members infected with COVID-19 at Fort Dix. (*Id.*). *Contra, United States v. McIntyre*, No. 07-cr-6174L (DGL), 2020 WL 3564782, at *2 (W.D.N.Y. July 1, 2020); *United States v. Garcia*, No. 18 CR 802-04 (CM), 2020 WL 2468091, at *5 (S.D.N.Y. May 13, 2020).

For the foregoing reasons, Elliott has not carried his burden of demonstrating that his medical conditions and susceptibility to contracting COVID-19 warrant his release. Further, irrespective of whether Elliott is able demonstrate that his medical conditions and vulnerability to contracting COVID-19 at FCI Fort Dix constitute extraordinary and compelling reasons warranting his release, his motion is denied because he has not demonstrated that he merits release under the sentencing factors set forth in 18 U.S.C. § 3553(a).[8] *See generally United States v. Pawlowski*, 967 F.3d 327, 329 (3d Cir. 2020); *United States v. Miranda*, No. 3:16-CR-128 (VAB), 2020 WL 2124604, at *4 (D. Conn. May 5, 2020).

Here, the inhumane nature of Elliott's criminal activity demonstrates that twenty-four months is a just sentence. (Sentencing Tr. 20:19-21:3). In particular, Elliott was found to have trained and bred dogs for dogfighting – a truly heinous activity. Law enforcement seized from Elliott numerous fighting dogs, as well as other dogfighting paraphernalia, including a hanging scale, break sticks, a breading stand, veterinary injectable drugs, needles, and intravenous bags. (1T 10:22-21). Generally, "there needs to be a message to the community that this activity is – it's criminal and it's horrific, and it will be punished if you engage in it." (1T 21:8-10). As such, reducing Elliott's sentence would undermine the deterrent effect in sentencing him to a term of twenty-four months' imprisonment. In sum, and for all of the foregoing reasons, Elliott's motion for compassionate release is denied.

---

[8] *Pawlowski* is instructive. There, the prisoner-appellant purportedly suffered from several very serious health conditions, "including hypertensive heart disease, chronic obstructive pulmonary disease (COPD), dyspnea (shortness of breath), sleep apnea, and has only one lung as a result of a pulmonectomy." *Pawlowski*, 2020 WL 4281503, at *1. These critical health conditions are among those identified by the CDC as risk factors for severe illness from COVID-19. *Id.* Further, the prisoner-appellant's facility (FCI Danbury) was particularly affected by COVID-19. *Id.* "Indeed, as of June 19, 2020, 98 inmates had tested positive for the virus, one of whom had died and 91 of whom had recovered." *Id.* (citation omitted). Still, notwithstanding the prisoner's critical health issues identified by the CDC as risk factors for severe illness from COVID-19 and FCI Danbury's precarious state, the Third Circuit affirmed the district court's denial of the motion based upon its evaluation of the § 3553(a) sentencing factors. *Id.* at *2-3. Thus, pursuant to *Pawlowski*, a prisoner's compassionate release motion may be denied where the district court determines that the sentencing factors warrant same, notwithstanding the prisoner's health conditions (which may be severe) and the conditions at the prison facility where the prisoner resides. *See id.*

## ORDER

**THIS MATTER** having come before the Court on Defendant Robert A. Elliott, Sr.'s ("Defendant") Motion for Compassionate Release, (ECF Nos. 333, 334); and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented; and for good cause shown; and for all of the foregoing reasons,

**IT IS** on this 14th of September, 2020,

**ORDERED** that Defendant's motion for compassionate release, (ECF Nos. 333, 334), is **DENIED**.

_____
PETER G. SHERIDAN, U.S.D.J.